**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**


**DAPHNE ANN GREEN**                                                        **PLAINTIFF**


**v.**                        **NO. 3:21-cv-00025 PSH**


**KILOLO KIJAKAZI, Acting Commissioner**                    **DEFENDANT**
**of the Social Security Administration**


## MEMORANDUM OPINION AND ORDER


Plaintiff Daphne Ann Green ("Green") challenges the denial of her application for supplemental security income payments. As her sole contention, she maintains that her residual functional capacity was erroneously assessed. Because substantial evidence on the record as a whole supports the decision of the Administrative Law Judge ("ALJ"), and he committed no legal error, his decision is affirmed.[1]

---

[1] The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id. "'Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law.'" See Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020) (quoting Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted)).

The record reflects that Green was born on June 13, 1974, and was forty-three years old on May 21, 2018, the amended alleged onset date. In her application for supplemental security income payments, she alleged that she is disabled as a result of various mental and physical impairments.

Mental Impairments. Prior to the amended alleged onset date, Green sought medical attention on several occasions for her mental impairments. For instance, on March 5, 2018, or approximately ten weeks before the amended alleged onset date, Green saw Dr. Scot Canfield, Ph.D., ("Canfield") for complaints of depression and anxiety. See Transcript at 383-404. Green's history was recorded to be as follows:

> ... Father is described as heavy drinker and psychically abusive toward [Green] and her siblings. [Green] states that she was a poor student making C-D average. [She] denies being a behavioral problem at school. [She] dropped out of school in grade 10 due to being pregnant. [She] completed her GED in 2000. [She] has worked in clerical positions, however, due to depression and anxiety has not worked in over 10-years. [She] married X3: age 18 lasting 3-years, "he was MR. Perfect and I left him and divorced"; age 25 lasting 3-years but divorced due to husband cheating frequently; age 33 married her current husband who is described as a recovering alcoholic and is on parole. Has spent much of the marriage in prison for burglary and parole violation. [Green] has 2 children from past relationships and 7 grandchildren. [She] is estranged from her younger son. [She] describes a HX for depression and anxiety. [She] attempted MHS in Jonesboro, AR but stated that she did not feel comfortable in the clinic so stopped going after a few visits. [She] has been TX for depression and anxiety by her PCP.

See Transcript at 384. Green's signs and symptoms included a depressed mood and a loss of interest and pleasure in daily activities. She reported difficulty sleeping, a loss of energy, and a diminished ability to think and concentrate. Canfield observed, though, that Green had an appropriate appearance, was fully responsive, and had an appropriate affect. Green's behavior was cooperative, her concentration was good, and her judgment and insight were also good. Canfield diagnosed a major depressive disorder, "recurrent severe with psychotic features.' See Transcript at 396. He prescribed medication that included Venlafaxine, Buspar, and Trazodone and recommended individual and family therapy. Although Canfield did not see Green for a physical impairment, Green reported being in no physical pain at the time of the presentation. See Transcript at 393-395.

On April 6, 2018, or approximately six weeks before the amended alleged onset date, Green saw Dr. Donald McDonald, M.D., ("McDonald") for continued complaints of depression and anxiety. See Transcript at 423-426. Green reported frequent panic attacks and hearing voices. A mental status examination was unremarkable. McDonald continued Green on medication, noting that Green had "just started" on medication and needed to give the medication more time. See Transcript at 426.

After the amended alleged onset date, the record contains several entries relevant to Green's mental impairments. For instance, on June 1, 2018, McDonald signed a note in which he represented that Green was on multiple psychiatric medications as she was having "severe social anxiety and hallucinates, especially under stress." See Transcript at 561. He also represented that she had neuropathy, making it difficult for her to stand.

A September 3, 2018, progress note prepared by McDonald reflects that Green admitted to not paying attention to the warning signs of a panic attack. See Transcript at 419-422. Green continued to report anxiety, insomnia, and auditory hallucinations. She was motivated for treatment and was cooperative, but her symptoms had not improved.

On October 30, 2018, Lisa Cunningham ("Cunningham"), a licensed professional counselor, completed a medical source statement-mental on Green's behalf. See Transcript at 503-505. In the statement, Cunningham opined that Green had extreme limitations in the following two areas: "the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," and "the ability to travel in unfamiliar places or use public transportation." See Transcript at 504. Cunningham opined that Green had marked limitations

in several areas, including the ability to understand, remember, and carry out detailed instructions. Cunningham opined that Green would miss work more than three days per month on account of her impairments and treatment. Cunningham identified Green's mental impairments as a major depressive disorder, recurrent with psychotic features, and a generalized anxiety disorder. Cunningham additionally noted the following: "The above diagnoses lead to low motivation, decreased interest in daily activities, fatigue, fearfulness, anxiety in public and becomes overwhelmed by tasks that require the completion of multiple tasks." See Transcript at 505.

On January 7, 2019, McDonald wrote a treatment plan review. See Transcript at 582-589. As a part of review, he noted the following:

> [Green] has a history of depression with anhedonia and avolition for over 2 weeks. [She] experiences anxiety and worry daily about multiple things such as financial issues and medical coverage. She has difficulty controlling her worry. She has panic attacks in which she feels she cannot breath and is going to die. She has anxiety when in public. This interferes with her ability to function outside of the house. Despite this, she was able to drive on two different occasions in which it had to be done. She was able to keep herself calm enough to arrive there and back safely. She has a history of auditory hallucinations that say negative things to her especially when she is in her bedroom. She has not reported any psychotic symptoms recently. She feels overwhelmed when there are multiple stresses and is unable to problem solve or think clearly. She has a history of memory problems that interfere with treatment compliance. This has not happened recently.

See Transcript at 584. Notwithstanding Green's complaints, she reported that her sleep had improved.

Also on January 7, 2019, Dr. Vickie Brewer Caspall, Ph.D., ("Caspall") performed a mental diagnostic evaluation of Green. See Transcript at 507-512. A mental status examination was largely unremarkable as Green had, inter alia, an adequate attitude, a calm and cooperative affect, and normal thought process and content. Caspall nevertheless diagnosed a persistent depressive disorder, mild, with "mood-congruent psychotic features" and "intermittent major depressive episodes, without current episode." See Transcript at 511. She also diagnosed "agoraphobia with panic attacks." See Transcript at 511. With respect to the effects of the impairments on Green's adaptive functioning, Caspall opined the following:

> How do mental impairments interfere with this person's day to day adaptive functioning? ...
>
> [Green] doesn't drive. She says she gets too nervous to drive. [She] relies on her husband for shopping but does occasionally go with him. [She] does not handle personal finances in terms of balancing checks and bill paying. [She] doesn't attend social functions. She rarely leaves her home. Performance of household chores is carried out by [Green] and her husband.
>
> Capacity to communicate and interact in a socially adequate manner?

It is my clinical impression that [Green] is capable of adequate, socially appropriate communication and interaction despite anxiety and depression.

Capacity to communicate in an intelligible and effective manner?

[Green] has the capacity to communicate in an intelligible and effective manner.

Capacity to cope with the typical mental/cognitive demands of basis work-like tasks?

[Green] was able to sustain attention and answer questions requiring multiple details. Verbal comprehension was deemed normal as [she] had no difficulty understanding the question [she] was asked during the diagnostic interview and it was not necessary to repeat questions on the mental status exam. Mental flexibility appeared below average.

Ability to attend and sustain concentration on basic tasks?

[Green] maintained focus and did not require refocusing. [She] was able to move from one topic to another with ease. [She] showed poor mental flexibility and working memory. There were no signs of problems with shifting attention.

Capacity to sustain persistence in completing tasks?

No signs of difficulty with persistence were observed during this examination.

Capacity to complete work-like tasks within an acceptable timeframe?

[Green] did not display remarkable psychomotor or cognitive slowing.

See Transcript at 511-512. Caspall additionally opined that Green was able to manage funds without assistance.

Green thereafter saw McDonald on at least three occasions for complaints related to Green's mental impairments. See Transcript at 579-581 (03/29/2019), 663-670 (06/25/2019), 672-675 (12/06/2019). The progress notes reflect that although Green was having stress because of problems associated with her children, her memory was improving and she was having fewer hallucinations. Her mental status examinations were typically unremarkable, and she continued to be prescribed medication that included Venlafaxine, temazepam, and Abilify.

Physical Impairments. Prior to the amended alleged onset date, Green sought medical attention on several occasions for her physical impairments. For instance, on January 30, 2018, or approximately four months before the amended alleged onset date, Green established care with Dr. Nicole Lawson, M.D., ("Lawson"). See Transcript at 361-364. Green's complaints included insomnia, loss of urinary control, and weight gain. A physical examination was largely unremarkable. Lawson diagnosed, in part, insomnia, acid reflux, chronic obstructive lung disease, and an overactive bladder. She prescribed medication that included Ambien, omeprazole, bupropion, and oxybutynin chloride.

Green saw Lawson at least two other times before the amended alleged onset date. See Transcript at 365-367 (02/13/2018), 368-371 (04/12/2018). Green reported that some of the medication was not working as she had hoped, and her insurance would not pay for some of the medication. At the second presentation, she additionally complained of chest pain, hip pain, and pain and swelling in her legs and feet. She was advised to avoid salt and keep her legs elevated. Testing of her chest and lower extremities was ordered. The test results were as follows: a chest x-ray revealed no acute findings, see Transcript at 436; an x-ray of her left ankle revealed no acute findings, see Transcript at 435; and an x-ray of her left foot revealed mild degenerative changes and no acute bony injury, see Transcript at 434.

On May 2, 2018, or approximately three weeks before the amended alleged onset date, Green saw Dr. Melissa Yawn, M.D., ("Yawn") for complaints of hip pain, left ankle pain, and heel pain. See Transcript at 372-375. Green reported that her hips were tender to touch, and her pain was exacerbated by walking. Yawn observed that Green's lower back and hips were tender to palpation, as were the arches of Green's feet. Yawn opined that Green likely had arthritic changes in her lower back and hip. Yawn prescribed an anti-inflammatory medication.

After the amended alleged onset date, the record contains multiple entries relevant to Green's physical impairments. For instance, on July 10, 2018, Green saw Lawson for a follow-up. See Transcript at 376-380. Green reported frequent, moderate joint pain aggravated by walking and weight-bearing exercise. She reported that the pain prevented her from standing for long periods of time. Although gabapentin was helping alleviate the numbness in her feet, she still had a burning sensation in them. A physical examination was unremarkable and showed, in part, that Green had normal motor strength and tone in her extremities and a normal gait and station. Lawson diagnosed, in part, "multiple joint pain" and continued Green on gabapentin. See Transcript at 380.

On August 27, 2018, Green established care with Dr. Matthew Jackson, M.D., ("Jackson"). See Transcript at 528-530. Green's chief complaint was back pain. She reported having recently fallen off a small step ladder but did not consider it to be a major event. A physical examination showed that she was positive for back pain, but the examination was otherwise unremarkable. Jackson gave Green an injection of Toradol. Although Green was not seen for a mental impairment, she was observed to have a normal mood and affect, normal behavior, and normal judgment and thought content.

Green thereafter saw Jackson on at least four occasions, primarily for Green's weight. See Transcript 524-527 (09/27/2018), 522-524 (10/24/2018), 519-522 (11/21/2018), 517-519 (12/20/2018). For instance, on November 21, 2018, Green presented for "follow up on weight loss." See Transcript at 519. She weighed 287 pounds and had a Body Mass Index of 44.95. She was exercising daily and "paying attention to calories." See Transcript at 519. The results of a physical examination were within normal limits. Jackson's diagnoses included peripheral polyneuropathy and morbid obesity, and he continued her on Adipex, gabapentin, and ropinirole.

Green received therapy for a period from Hunter Finney ("Finney"), a physical therapist. At an October 1, 2018, presentation, Finney recorded the details of Green's present illness to be as follows:

> [Green] presents today with complaint of bilateral hip pain x several years. [She] thought it was initially due to weight gain, but feels that it may be due to other causes as her most recent injections helped with her pain. [She] just underwent injections in both hips approx. 1 week ago. [She] reports no recent imaging studies. [Green] denies any MOI, but does report she has fallen on both hips before. [She] reports increased pain with prolonged sitting, any standing, walking. [She] reports decreased pain with use of pain meds and sitting in her recliner. [She] reports being able to sleep about 4-5 hours at a time before waking due to pain. [She] reports also having increased pain during her menstrual period. [She] reports very occasional shooting pains down the LEs.

<u>See</u> Transcript at 493. Green was discharged from therapy on November 14, 2018. At that time, Finney provided the following assessment of Green's condition:

> [Green] made good progress during therapy sessions, meeting 3/3 STGs and 1/3 LTGs. [She] was consistent with doing her Home Exercise Program throughout care. [She] had a good reduction in pain, rating pain at 4/10 at last session. [She] reports 56% impairment using the FOTO. [Green] was able to tolerate a variety of lower extremity strengthening exercises during her sessions and was primarily limited by fatigue. At this time, [she] has requested to discharge from Physical Therapy services due to difficulty attending therapy sessions due to transportation issues. ...

<u>See</u> Transcript at 449.

Green also sought medical care from Dr. Praveen Pakeerappa, M.D., ("Pakeerappa") for chronic hip and knee pain. <u>See</u> Transcript at 571-574 (10/22/2018), 567-570 (12/19/2018), 563-566 (02/27/2019). The progress notes reflect that Green repeatedly complained that her pain was exacerbated by standing, walking, and movement. At the February 27, 2019, presentation, she reported that her pain was not manageable with activity modification, home exercises, or pain medication. A physical examination revealed low back and hip pain upon palpation. Pakeerappa continued Green on medication and considered a steroid injection.

On February 13, 2019, Dr. Omar Aziz, M.D., ("Aziz") performed a hysteroscopy in an attempt to address the heavy bleeding Green was experiencing, bleeding apparently caused by a polyp. See Transcript at 611-614. Aziz subsequently saw Green for complaints that included urinary stress incontinence. See Transcript at 605-606 (03/06/2019), 592-593 (05/16/2019), 594 (05/23/2019).

On July 1, 2019, Green saw Jennifer Dorris ("Dorris"), a nurse practitioner for neuropathic pain and numbness in Green's hands and feet. See Transcript at 646-651. A physical examination was positive for myalgia, but Green otherwise had a normal range of motion. Although Green was not seen for a mental impairment, she was observed to have a normal mood and affect, normal behavior, and normal judgment and thought content. Dorris' diagnoses included dyshidrotic eczema, peripheral neuropathy, and morbid obesity. Dorris prescribed topical Kenalog and refilled Green's prescriptions for gabapentin, which had proven beneficial; Ventolin; and Trazodone.

After the amended alleged onset date, Green also underwent medical testing. On September 17, 2018, an x-ray of her right knee showed mild degenerative changes but no acute bony injury. See Transcript at 443. An x-ray of her left knee showed a small joint effusion. See Transcript at 444.

The record contains a summary of Green's work history. See Transcript at 228-239. The summary reflects that she has a very poor work history.

Green completed a series of documents in connection with her application for supplemental security income payments. See Transcript at 284-285, 287, 291-297. In the documents, she represented that she experiences pain or other symptoms all day, she cannot stand or walk for any length of time, and she can only sit for about thirty minutes. She has difficulty being in public or around other people, in part, because she hears voices, experiences hallucinations, and has severe anxiety. She can attend to her personal care, prepare simple meals, and perform minor household chores. She spends most of her day watching television.

Green testified during the administrative hearing. See Transcript at 40-56, 57-59. At the outset of hearing, Green's attorney represented that Green is disabled "for physical but primarily mental problems that she has." See Transcript at 39. Green lives in a camper trailer on property she owns with her husband. She stands sixty-seven inches tall and weighs 270. When asked about her attempt to find full-time employment, she testified as follows:

Q. ... Since May of '18, have you tried to find full-time work?

A. I have and it's real hard for me to even leave the house sometimes. You know.

Q. Okay. Well, tell me why.

A. I have bad—real bad anxiety and it's real hard for me to be in a crowd. I get real anxious and I can't—sometimes I can't think straight ...

See Transcript at 42. Therapy at Life Strategies has proven to be helpful in treating her anxiety. She experiences neuropathy that makes it difficult for her stand for long periods. She also has Chronic Obstructive Pulmonary Disease, for which she takes Albuterol, uses an updraft machine, and uses an inhaler. In addition, she has an overactive bladder. Green's mental impairments limit her ability to leave her home and limit her ability to interact with her family. She has no friends who visit her, and she limits her contact with other people to living with her husband and texting with her mother. She spends her days primarily watching television but does some cooking and cleaning. Green can occasionally concentrate enough to watch a movie or read the Bible. Although she does not have a "medical marijuana card," she occasionally smokes marijuana to ease her pain. See Transcript at 51. She has exercised in the past but no longer does so.

The ALJ found at step two that Green has severe impairments in the form of "obesity, bilateral hip bursitis, peripheral neuropathy, degenerative joint disease of the left knee, lumbosacral spondylosis, degenerative joint disease of the feet, anxiety, depression, and agoraphobia." See Transcript at 15. The ALJ assessed Green's residual functional capacity and found that Green is capable of light work with the following additional limitations:

> ... [Green] could never climb ladders, ropes or scaffolds but could occasionally stoop, kneel, crouch, crawl and climb ramps and stairs and should avoid concentrated exposure to excessive vibration. [She] could make simple work-related decisions and maintain concentration, persistence and pace for two hours at a time for simple tasks, could understand, remember and carry our simple work instructions and procedures. She could adapt to changes in the work setting that were simple, predictable and easily explained and supervision should be simple, direct and concrete. [She] could have occasional and superficial interactions with supervisors, coworkers and the public.

See Transcript at 18. As a part of so finding, the ALJ discounted McDonald and Cunningham's medical opinions because their opinions were not supported by their own treatment notes and were otherwise inconsistent with other evidence in the record. The ALJ then found that although Green has no past relevant work, there is other work Green can perform and is therefore not disabled.

Green maintains that her residual functional capacity was erroneously assessed in two respects. First, "the psychological evidence indicates that Green is more limited mentally than found by the ALJ, and the ALJ failed to account adequately for [Green's] limitations in her ability to maintain concentration, persistence, and pace." See Docket Entry 17 at CM/ECF 28-29. Second, "the ALJ failed to develop the record by obtaining an opinion from a treating or examining physician about Green's physical capabilities, and the evidence does not support a finding that Green can perform light work." See Docket Entry 17 at CM/ECF 28.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The ALJ does so by considering all of the evidence in the record. See Grindley v. Kijakazi, 9 F.4th 622 (8th Cir. 2021).

The Court has reviewed the record and finds that substantial evidence on the record as a whole supports the ALJ's assessment of Green's residual functional capacity. The ALJ adequately evaluated all of the evidence relevant to Green's mental impairments, which her attorney represents are the primary reason Green is allegedly disabled. The ALJ accounted for the limitations caused by the impairments and could and did

find that the limitations, while meaningful, are not disabling. The ALJ also evaluated all of the evidence relevant to Green's physical impairments, specifically, her spinal and musculoskeletal impairments and her peripheral neuropathy. The ALJ accounted for the limitations caused by the impairments but could and did find that the limitations are not disabling. The Court so finds for the reasons that follow.

The evidence relevant to Green's mental impairments and the limitations they cause is inconsistent and is capable of more than one acceptable characterization, one of which the ALJ made. Although Green reported, inter alia, depression, anxiety, hallucinations, and panic attacks, she typically had an appropriate appearance; normal mood and affect; pleasant, cooperative behavior; and normal judgment and thought content. Green has a history of memory problems and reported difficulties sleeping, but McDonald observed in 2019 that Green's memory and sleep were improved.

Green has taken medication for her mental impairments, medication that included Venlafaxine, Buspar, and Abilify. She reported some benefit from the medication, particularly Abilify, as she reported doing much better as a result of having taken it. The ALJ could and did find that the treatment was "generally effective." See Transcript at 22.

The results of Caspall's mental status examination, which the ALJ credited, were unremarkable. Caspall observed that Green was capable of adequate, socially appropriate communication and interaction despite anxiety and depression. Green was able to sustain attention and answer questions requiring multiple details, although her mental flexibility was poor. Green was able to maintain focus, had no difficulty with persistence, and displayed no remarkable psychomotor or cognitive slowing.

Green faults the ALJ for the manner in which he handled McDonald and Cunningham's medical opinions. The Court finds that the ALJ could handle the opinions as he did. Specifically, the ALJ could and did find that the opinions were not supported by McDonald and Cunningham's own treatment notes, and the opinions were otherwise inconsistent with other evidence in the record.[2]

---

[2]     "... Under the new regulatory scheme, the Commissioner 'will not defer or give any specific weight, including controlling weight, to any medical opinion(s),' including those from treating physicians. 20 C.F.R. 404.1520c(a). Instead, ALJs will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability; consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion. 20 C.F.R. 404.1520c(a), (c). ALJs are required to 'explain' their decisions as to the two most important factors— supportability and consistency. 20 C.F.R. 404.1520c(b)(2). The 'more relevant the objective medical evidence and supporting explanations presented' and the 'more consistent' a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be. 20 C.F.R. 404.1520c(c)(1)-(2)."

See Phillips v. Saul, No. 1:19-cv-00034-BD, 2020 WL 3451519, 2 (E.D.Ark. 2020).

On June 1, 2018, McDonald signed a note in which he represented that Green was on multiple psychiatric medications as she was having "severe social anxiety and hallucinates, especially under stress." See Transcript at 561. Seven months later, he wrote a treatment plan review in which he opined, in part, that she had difficulty controlling her worry, had panic attacks in which she feels she cannot breath and is going to die, and had anxiety when in public. His progress notes from approximately the same period, though, reflect largely unremarkable observations. For instance, on April 6, 2018, and again on March 29, 2019, McDonald observed that Green was fully responsive, fully oriented, had an appropriate affect, cooperative behavior, good concentration, a complete and intact memory, and an euthymic mood. See Transcript at 425, 581. Her psychosis was doubtful, and her judgment and insight were good.

On October 30, 2018, Cunningham completed a medical source statement-mental in which she opined that Green had extreme limitations in two areas, marked limitations in several other areas, and would miss work more than three days per month. It is not clear, though, what evidence she relied upon in formulating the opinions. As the ALJ could and did find, Cunningham did not support her conclusions with "treatment records or an explanation." See Transcript at 24.

It is also possible to construe McDonald and Cunningham's medical opinions as being inconsistent with other evidence in the record. First, although Caspall diagnosed a depressive disorder and agoraphobia with panic attacks, she opined that the effects of Green's mental impairment on her adaptive functioning were not compelling. Second, Green's daily activities—activities that include use of a cell phone for texting; watching television; and occasional cooking, cleaning, and watching a movie—indicate abilities greater than she alleged.

Green faults the ALJ for failing to adequately address Green's limitations in concentration, persistence, and pace. The Court cannot agree for at least two reasons. First, the evidence is inconsistent with respect to Green's limitations in those areas. Although McDonald and Cunningham opined that Green had significant limitations in concentration, persistence, and pace, Caspall opined otherwise. Specifically, Caspall opined, inter alia, that Green was able to sustain attention and answer questions requiring multiple details, could maintain focus, and had no difficulties in persisting. The ALJ could and did discount McDonald and Cunningham's opinions with respect to Green's limitations in concentrating, persisting, and in pace but could and did credit Caspall's opinions as to those areas.

Second, notwithstanding the foregoing, the ALJ crafted Green's residual functional capacity to include the following limitations:

> ... [She] could make simple work-related decisions and maintain concentration, persistence and pace for two hours at a time for simple tasks, could understand, remember and carry our simple work instructions and procedures. She could adapt to changes in the work setting that were simple, predictable and easily explained and supervision should be simple, direct and concrete. [She] could have occasional and superficial interactions with supervisors, coworkers and the public.

See Transcript at 18. The Court is satisfied that the foregoing assessment accounts for any limitations Green has in maintaining concentration, persistence, and pace.

With respect to the evidence relevant to Green's physical impairments and the limitations they cause, the evidence is inconsistent. It is capable of more than one acceptable characterization, one of which the ALJ made. Although Green repeatedly complained of pain in her back and lower extremities, the medical testing is unremarkable. Testing of her left ankle and left foot performed in April of 2018 showed only mild degenerative changes in her left foot. X-rays taken in September of 2018 showed only mild degenerative changes in her right knee and a small joint effusion in her left knee.

The findings of the medical professionals are largely unremarkable, particularly the findings of Lawson, Jackson, and Finney. Although Green complained of pain in back, hips, and lower extremities, she routinely had, as the ALJ could and did find, "normal ambulation, no edema, crepitus, or cyanosis in her extremities, normal motor strength, normal movement of all extremities, normal range of motion in her hips and ankles, no pain in her lumbar spine with movement, negative McMurray's test and normal deep tendon reflexes." See Transcript at 20.

Notwithstanding the lack of compelling evidence relevant to Green's physical impairments and the limitations they cause, the ALJ accounted for the limitations Green has. Specifically, the ALJ crafted Green's residual functional capacity to include the following limitations: "she could never climb ladders, ropes or scaffolds but could occasionally stoop, kneel, crouch, crawl and climb ramps and stairs and should avoid concentrated exposure to excessive vibration." See Transcript at 18. The Court finds that the assessment satisfactorily accounts for the limitations she has.

Green faults the ALJ because the record contains no physical assessment from a treating or examining physician. Although the record contains no such assessment, the lack of one in this instance does not warrant a remand.

The ALJ also has an obligation to fully develop the record. <u>See</u> <u>Battles v. Shalala</u>, 36 F.3d 43 (8th Cir. 1994). There is no bright line test for determining whether the ALJ fully developed the record; the determination is made on a case by case basis. <u>See</u> <u>Id</u>. It involves examining whether the record contains sufficient information for the ALJ to have made an informed decision. <u>See</u> <u>Pratt v. Asture</u>, 372 Fed.Appx. 681 (8th Cir. 2010).

With respect to the assessment of a person's residual functional capacity, there is no requirement that the assessment be supported by a specific medical opinion. <u>See</u> <u>Hensley v. Colvin</u>, 829 F.3d 926 (8th Cir. 2016). In the absence of opinion evidence, the medical records of the most relevant treating physicians can provide affirmative medical evidence supporting the ALJ's assessment. <u>See</u> <u>Id</u>.

The Court is satisfied that the ALJ adequately developed the record, and there is sufficient information for him to have made an informed decision as to limitations caused by Green's physical impairments. He could and did rely upon the medical records prepared by her medical professionals and non-medical evidence that included her daily activities. <u>See</u> Transcript at 19-21. The ALJ could and did find that the evidence was unremarkable and showed few significant objective abnormalities.

Green faults the ALJ because he found she could perform light work, which requires her to be capable of standing and/or walking for a total of six hours in an eight-hour workday. She maintains that there is no evidence she can stand and/or walk for that length of time. The ALJ, though, could find as he did. As the Court has noted, the evidence relevant to the limitations caused by Green's physical limitations is inconsistent. The medical testing, the findings of the medical professionals, and the lack of significant limitations in her daily activities are unremarkable.

Green faults the ALJ for failing to consider that Green is morbidly obese. The Court cannot agree. The ALJ found that obesity was one of Green's severe impairments, <u>see</u> Transcript at 15, and he considered the impairment in assessing her residual functional capacity, <u>see</u> Transcript at 21. She has failed to explain how her obesity results in limitations that exceed the assessment he made.

It is true that <u>Morrison v. Apfel</u>, 146 F.3d 625 (8th Cir. 1998), requires the ALJ to include the claimant's obesity in asking a hypothetical question, which the ALJ here did not do. Those instances, though, are limited to ones in which obesity is identified as a "major medical issue." <u>See</u> <u>Burnett v. Colvin</u>, 3:14-cv-00012-JTK, 2014 WL 5795788 at 2 (E.D.Ark. 2014). There is little evidence that Green's obesity is a "major medical issue."

Green last faults the ALJ for the manner in which he considered some of her daily activities, noting that the activities he identified do not establish she could perform light work.[3] Again, the Court cannot agree. In assessing her residual functional capacity, he noted, in part, that "she reported engaging in activities such as painting, driving, collecting cans for pocket money, helping her husband with grounds keeping duties, and cooks and cleans on a daily basis." See Transcript at 21. The record indicates that Green has performed most of those activities at times shortly before, and/or after, the amended alleged onset date. To the extent the ALJ mischaracterized one of her activities, e.g., "[Green] did not say that she helped her husband with his groundskeeping work," see Docket Entry 17 at CM/ECF 25, the Court cannot say that the mischaracterization warrants a remand.

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the ALJ's decision if that decision is supported by good reason and is based on substantial evidence. See Dillon v. Colvin, 210 F.Supp.3d 1198 (D.S.D.

---

[3]    In evaluating the intensity, persistence, and limiting effects of a claimant's pain or other symptoms, the ALJ must consider all the evidence, including evidence of the claimant's daily activities. See Social Security Ruling 16-3p. See also 20 CFR 404.1529; Polaski v. Heckler, 751 F.3d 943 (8th Cir. 1984) (identifying factors substantially similar to those of Social Security Ruling 16-3p).

2016). In fact, the Court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision. See Id. Here, the ALJ could find as he did with respect to Green's left hand impairment.

In conclusion, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings, and he did not commit legal error. Green's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 6th day of April, 2022.

_____
UNITED STATES MAGISTRATE JUDGE